Sai
*Pro Se*
500 Westover Drive #4514
Sanford, NC  27330
Telephone: (510) 394-4724
Facsimile:  (206) 203-2857
legal@s.ai

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAI,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>COVENANT AVIATION SECURITY, LLC, a California limited liability company, CHAMPAGNE ELLISON, an individual, JOHN ORILLE, an individual, MICHAEL SURENO, an individual, KRISTY AKENS, an individual, DOES 101-200, and KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security<br><br>　　　　　Defendants. | Case No. 3:16-cv-01024-JST<br><br>Hon. Jon S. Tigar<br><br>**THIRD AMENDED COMPLAINT[1] FOR:**<br><br>*(1)* ~~NEGLIGENT SUPERVISION (FTCA);~~<br>*(2)* **ASSAULT;**<br>*(3)* **BATTERY;**<br>*(4)* **NEGLIGENCE;**<br>*(5)* **VIOLATION OF THE REHABILITATION ACT OF 1973 UNDER 29 U.S.C. § 701** *et seq.***;**<br>*(6)* **VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 UNDER 42 U.S.C. § 12101** *et seq.*<br>*(7)* ~~VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT;~~<br>*(8)* ~~VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT;~~<br>*(9)* ~~VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT; AND~~<br>*(10)* ~~VIOLATION OF THE ADMINISTRATIVE~~ |

---

[1] Claims in strikethrough were dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and are preserved for appeal. DHS Secretary Kirstjen Nielsen, in official capacity, has been added as a defendant, *id*.

~~PROCEDURE ACT~~

**Demand for Jury Trial**

## PARTIES
### Plaintiff

**Sai**

500 Westover Dr. #4514

Sanford, NC 27330

Phone: (510) 394-4724

Fax: (206) 203-2827

legal@s.ai

### Defendants

~~David Smith~~

~~James Adams~~

~~Does 1-100 (TSA employees)~~

~~Department of Homeland Security~~

~~Transportation Security Administration~~

~~United States of America~~

**Champagne Ellison**

**John Orille**

**Michael Sureno**

**Kristy Akens**

**Does 101-200 (CAS employees)**

2

**Covenant Aviation Security, LLC**

C/O Richard Grotch

Coddington, Hicks & Danforth, APC

555 Twin Dolphin Drive, Suite 300

Redwood City, CA 94065-2133

Phone: (650) 592-5400

Fax: (650) 592-5027

rgrotch@chdlawyers.com


**Kirstjen Nielsen**

**Secretary, Department of Homeland Security**

***In official capacity***

C/O Wendy M. Garbers

United States Attorney's Office

Northern District of California

450 Golden Gate Ave., 9th Floor

San Francisco, CA 94102

Phone: (415) 436-6475

Fax: (415) 436-7234

wendy.garbers@usdoj.gov

(THIRD AMENDED COMPLAINT)

## INTRODUCTION

1.     On March 1, 2013, plaintiff, whose full legal name is Sai ("SAI"), had a ticket to fly on Delta Air Lines flight 1510 from San Francisco International Airport ("SFO") with a layover in Atlanta and the final destination at Raleigh-Durham International Airport ("RDU").

2.     During screening at the Transportation Security Administration ("TSA") checkpoint before boarding, Sai was subjected to a nearly one-hour search simply for correctly asserting the right to bring medically necessary liquids on board and demanding that TSA obey its own written policy.

3.     Multiple TSA representatives at SFO, including Covenant Aviation Security, LLC ("CAS") employees, harassed SAI about SAI'S medically necessary liquids and denied SAI the ability to freely drink them when needed, all in violation of TSA policy.

4.     Although TSA tested the liquids using x-ray and explosive trace detection ("ETD") technology, proving the liquids were not a threat to aviation security, and harbored no doubt that the liquids were exactly what they seemed—completely harmless aloe juice—TSA seized the liquids, preventing SAI from traveling with them as intended, also in violation of TSA policy.

5.     SAI has permanent, episodic neurological disabilities that cause painful muscle spasms, mutism, and even paralysis.  Liquids, especially those with electrolytes, can prevent or minimize the symptoms if taken when SAI feels an episode coming on, which happens shortly before an episode.

6.     Stress triggers and exacerbates the symptoms of SAI'S disabilities. For SAI, air travel is very stressful—particularly after having repeatedly suffered abuse at the hands of TSA screeners.  SAI has on multiple occasions experienced acute symptoms during and shortly after flights due to not having immediate access to medically necessary liquids that were seized or involuntarily surrendered during TSA airport screenings.

(THIRD AMENDED COMPLAINT)

7.     By seizing SAI'S medical liquids, CAS and TSA personnel again put SAI'S health at risk on this flight, and SAI suffered an episode that could have been prevented, or at least ameliorated, if TSA and CAS had obeyed TSA's medical liquid policy.

## JURISDICTION

8.     This Court has subject matter jurisdiction over claims made against TSA, Department of Homeland Security ("DHS"), the United States, David Smith, and James Adams (collectively "FEDERAL DEFENDANTS") pursuant to 28 U.S.C. § 1331 because such claims arise under the United States Constitution, the Federal Tort Claims Act, and the Rehabilitation Act.

9.     This Court has subject matter jurisdiction over the claims made against CAS, Champagne Ellison ("ELLISON"), John Orille ("ORILLE"), Michael Sureno ("SURENO"), and Kristy Akens ("AKENS") (collectively "CONTRACTOR DEFENDANTS") pursuant to 28 U.S.C. § 1367(a) because such claims are "part of the same case or controversy" arising from the incidents hereunder described at SFO.

## VENUE

10.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because "a substantial part of the events or omissions giving rise to the claim[s] occurred" at SFO.

## STATEMENT OF FACTS

### SAI'S Disabilities

11.     SAI has multiple, permanent, episodic neurological disabilities. Among other symptoms, these disabilities cause:

a.    painful, uncontrollable muscle spasms of the arm, neck, leg, or entire body, sometimes resulting in bruising and other injuries;

b.    mutism, which is especially problematic if people nearby do not know American Sign Language (in which SAI is fluent);

c.    extreme light sensitivity ("photophobia") to the point of functional blindness and severe pain in most lighting conditions; and

d.    temporary, full-body paralysis, which completely prevents communication with most people.  This paralysis regularly causes severe pain from inability to maintain a comfortable posture, pinched nerves or blood vessels, or coming to rest on a hard surface.  It can also even cause inability to swallow that is life-threatening due to the potential of drowning on saliva.

12.    SAI'S stress level and the frequency and severity of the episodes are directly correlated: the more physical and/or psychological stress SAI experiences, the more likely an episode is to occur, and the more severe will likely be.

13.    Fortunately, SAI can normally sense the onset of an episode before it reaches its crescendo and usually takes immediate preventative or ameliorative actions to minimize any controllable factors and to be prepared to go through an upcoming episode with less risk of harm.

14.    In particular, food and drink, especially during the onset period, can prevent or minimize the symptoms of an episode.  Involuntarily muscle spasms consume a significant amount of energy, and without adequate nourishment, cause post-episode impairment.  For this reason, SAI is careful to always have both within immediate reach, especially while traveling.

15.    Because muscle spasms can make drinking from a light container difficult and sometimes dangerous, SAI normally uses heavier, shatterproof vessels (*e.g.*, large plastic bottles), which provide more stability.

16.    Because traveling imposes functional limits on the size and weight of items that can be carried, SAI generally travels with liquids that serve multiple

purposes simultaneously—hydration, nourishment, electrolyte replacement, and nausea reduction.  These primarily include aloe juice, non-alcoholic ginger beer, Odwalla Superfood™, and similar products.

17.     In short, SAI requires access to food and liquid at all times, especially because of the constant potential of debilitating, painful, communication-impairing, and even life-threatening symptoms.  Although food and liquid can prevent some episodes, high stress levels can make an episode unavoidable.  However, these episodes are at least ameliorated by nourishment.

### TSA's Liquids Policy

18.     Prior to the SFO incident, the TSA and/or DHS had issued a ban on passengers taking liquids onto airplanes, which went into effect on August 10, 2006 ("Liquids Ban").  The Liquids Ban was a substantive change that prevented passengers from bringing toiletries and creams, but more importantly prevented passengers from taking water and other liquid nourishment onto planes.  The ban had an immediate impact on travelers' health and required them to spend substantially more money because they were required to throw out any liquids brought with them and purchase other liquids once inside the airport.  The Liquids Ban went into effect, and has remained in effect as modified by subsequent TSA and/or DHS press releases or memorandum, without being first released in the Federal Register and without a notice and comment period.

19.     At the time of the SFO incident, TSA's official written had evolved from a complete ban on liquids to one aimed at containers over 3.4 ounces.  By way of a September 25, 2006 memorandum from Sandra Cammaroto, Division Manager, TSA Office of Screening of Persons with Disabilities, entitled "Changes in Allowances for Persons with Disabilities at Airport Security Checkpoints" ("Special Needs Memo") (attached hereto as **Exhibit 1**) passengers were allowed to take liquids onto planes in "**travel-size toiletries (3 ounce or less) in ONE,**

**QUART-SIZE, clear plastic, sealable bag** through security checkpoints" ("3-1-1 RULE").

20.     The Special Needs Memo also stated the TSA and/or DHS's policy on liquids "needed by persons with disabilities and medical conditions." (Ex. 1 at p. 3.) The Special Needs Memo states in relevant part:

> We are ***continuing to permit*** prescription liquid medications and other liquids needed by persons with disabilities and medical conditions. This includes:
>
> * * *
>
> • liquids (to include water, ***juice***, or liquid nutrition) or gels for passengers with a disability or medical condition;
>
> * * *
>
> Passengers with disabilities and medical conditions can choose to put their small bottles/items of liquid medication in the one quart sealable bag (mixed with toiletries) without the need to declare these items. However, if the liquid medications are in volumes larger than 3 oz. each, they may not be placed in the quart-size bag and must be declared to a Transportation Security Officer. A declaration can be made verbally, in writing, or by a person's companion, caregiver, interpreter, or family member. Declared liquid medications and other liquids for disabilities and medical conditions must be kept separate from all other property submitted for x.-ray screening.
>
> It is recommended (***not required***) that passengers bring along any supporting documentation (ID cards, letter from doctor, etc.) regarding their medication needs. It is recommended, not required, that the label on prescription medications match the passengers boarding pass. If the name on prescription medication label docs not match the name of the passenger, the passenger should expect to explain why to the security officers. To ensure a smooth screening process, passengers are encouraged to limit quantities to what is needed for the duration of the flight."

(Ex. 1, pp. 2–3 (emphasis added).)

21.     The Special Needs Memo became effective September 26, 2006. (Ex. 1 at p. 1.) The Special Needs Memo went into effect, and has remained in effect as a ban on liquids with few exceptions, without being first released in the Federal Register and without a notice and comment period. The Special Needs Memo was a substantive change to the prior total ban on liquids and again substantively changed airline passengers' experience.

(THIRD AMENDED COMPLAINT)

22.   Nonetheless, SAI followed the Special Needs Memo to the letter. SAI'S medical liquids did not "alarm" after ETD and x-ray testing.  But the FEDERAL DEFENDANTS violated the Special Needs Memo by refusing to screen SAI'S medically necessary liquids and refusing to allow them through the checkpoint.

23.   In addition to baggage x-ray, TSA checkpoints include specifically dedicated liquid container screening ("LCS") machines and ETD machines.  ETD and LCS testing takes less than a minute.

24.   Sai explicitly requested the screeners perform these tests in order to expedite the screening process and SAI'S ability to access the liquids that were immediately medically necessary—but the screeners refused to do so.

25.   TSA has publicly stated that the 3-1-1 RULE is based on determinations of the volume of liquid that is presumptively safe, *i.e.* that is too small to be used as a weapon, explosive, or incendiary device ("WEI") that would be harmful to the security of aviation.

### TSA Representative Screening at SFO Takes SAI's Medically Necessary Liquids

26.   On March 1, 2013, SAI approached the security screening area at SFO with carry-on possessions, including medically necessary liquids—namely two transparent, plastic, 50.7-ounce bottles of aloe juice which contains electrolytes, including sugar and sodium.

27.   SAI presented travel documents to the TSA document checker and was directed to the x-ray machines for TSA to scan carry-on items.

28.   Pursuant to TSA policy, SAI declared the medical liquids to the TSA screener operating the x-ray machine.

29.   SAI presented the liquids separately for inspection.  SAI also opted out of the electronic body scan.  And that is when problems began.

30.     The TSA representative acknowledged Sai had declared medical liquids.  However, despite TSA's written policy that there is no limit on the volume for medical liquids and the ready availability of technology to easily screen liquids, the TSA representative refused to screen the aloe juice or let it through, because the bottles were "too large to go through."

31.     The TSA representative also asked SAI for documentation proving the bottles contained a medical liquid, despite the explicit statement in TSA's written medical liquids policy that "[i]t is . . . not required . . . that passengers bring along any supporting documentation" (Ex. 1, p. 2), that medical liquids "include water, juice, or liquid nutrition" (*id*.), and that the bottles were clearly labeled and visually obvious as aloe juice.

32.     The TSA representative also demanded to know SAI'S destination, which had nothing to do with opting out of the body scan or declaring medical liquids.  Due to privacy concerns, SAI refused to volunteer that information.  The TSA representative then asserted, incorrectly, that SAI was required to disclose this information for screening.

33.     SAI had read the Special Needs Memo, knew that it was being violated, and, therefore, demanded to speak with a manager.

34.     In response to the call for a manager, Assistant Terminal Manager ("ATM") ELLISON arrived at the checkpoint.  ELLISON acknowledged SAI had declared the aloe juice as a medical liquid.  She also claimed the bottles were too large.

35.     SAI was disappointed that even a manager did not know the Special Needs Memo policy, and directly asked whether ELLISON was an employee of TSA.  Ellison avoided the question multiple times, claiming she was "a representative of TSA," "the assistant manager for this terminal," "an agent for the TSA," and that "Covenant is the company that we work with."  Finally, ELLISON admitted she was not a TSA employee and actually worked for a contractor, CAS.

10

(THIRD AMENDED COMPLAINT)

36.    More than fifteen minutes into this screening, wanting to finish the checkpoint screening and have access to medical liquids, SAI complained about TSA's prolonged detention, rather than TSA promptly screening the bottles of aloe juice as required by the its liquids rule.  Despite that SAI had repeatedly referenced TSA's Special Needs Memo and the exception for medical liquids, ELLISON claimed SAI had to stay in the screening area so TSA could verify whether the aloe juice was something SAI could take on board.

37.    More than twenty minutes into the stressful screening, SAI began to experience onset symptoms, such as visible hand and arm tremors.  When SAI reached for a bottle of aloe juice to head off or ameliorate an imminent episode, one of the TSA representatives put his hand on top of SAI'S hand and physically prevented SAI from picking up the bottle.

38.    A TSA representative then started the "pat down" procedure because SAI had opted out of the electronic screening.

### Detention and Interrogation by TSM Smith

39.    During the "pat down" the first TSA employee, SMITH, arrived.

40.    ELLISON explained to SMITH that SAI declared the two bottles of aloe juice as medical liquids, but SMITH acted like this was a joke.  In a sarcastic and accusatory tone SMITH asked if the aloe juice was "really" medical.  The TSA liquid policy does not require a doctor's note or a prescription and SAI refused to provide any unwarranted evidence or indulge such a privacy-invasive and medically unqualified interrogation.

41.    SMITH went on in his sarcastic line of questioning by mocking the price on the aloe juice labels and asking whether you can really "buy a medical liquid for $2.99?"  SMITH then told SAI that if SAI refused to answer SMITH's questions then SMITH would have to deny letting the liquid through because he could not get "any information," though this information is explicitly "not required"

11

by the plain language of the Special Needs Memo and has nothing to do with the physical screening of the liquids.

42.    This exchange continued, with SMITH apparently asking for SAI's medical information and demanding to know where SAI purchased the bottles. According to SMITH, the fact SAI bought the aloe juice from a store "answers the question" of whether the aloe juice is a medical liquid—and the answer he found was "no."

43.    Now thirty minutes into the screening, SAI's hand began shaking even worse from tremors, indicating an episode likely to be more imminent and/or severe than would have been with the immediate and constant access to medical liquids that SAI requires.  SAI again told the TSA representatives about the immediate need for medical liquids, but they refused to allow SAI to drink.  The TSA representatives said they were going to wait for SMITH to be finished with his line of questioning before SAI would be allowed to drink because SMITH, as a manager and direct TSA employee, had taken over the questioning and "that's what [SAI] wanted."

44.    SAI was not allowed to drink because the bottles had not been tested for explosive residue.  Apparently, the screening had not "gotten to that stage of the process" even though the bottles could and should have been tested at any point during this screening, which at this point had lasted more than thirty minutes.

45.    SAI was offered water.  But as SAI had repeatedly explained during this screening, and as discussed above, SAI needed the sugar in the aloe juice.  SAI took the small paper cone cup filled with water into a trembling hand, but most of the water spilled onto the floor.

46.    Shortly after SMITH's sarcastic interrogation, he stepped away to take a phone call with the Assistant Federal Security Director at SFO, ADAMS. SMITH remained close by and could be heard telling ADAMS that SAI purchased the "medical liquids at the store, and he got them for $2.99."

(THIRD AMENDED COMPLAINT)

47.    SAI is informed and believes, and on that basis alleges, that water and juice are approved medical liquids according to TSA's policy, and that both water and juice can be purchased at any number of locations, including grocery stores, pharmacies, gas stations, and vending machines.

48.    The Special Needs Memo explicitly states "water, juice, or liquid nutrition" are medical liquids.  SAI purchased the aloe juice from an ordinary grocery store as part of preparation for travel.

### SMITH Returns After His Phone Call with ADAMS

49.    SMITH advised SAI that ADAMS was refusing to allow the aloe juice through as a medical liquid because of the size of the bottles.  SMITH specifically acknowledged that he had read the Special Needs Memo, and that he knew there is no restriction on the volume of medical liquids.  Nonetheless, he still refused to accept the aloe juice as a medical liquid because of the size of the bottles.

50.    One of SMITH'S bases for refusing to allow SAI to proceed with the medically necessary aloe juice was that the bottles say "tropical energy drink." SMITH apparently believed juice does not constitute a medical liquid, despite the Special Needs Memo's explicit statement to the contrary.

51.    One of the "options" SMITH gave to SAI was to allow SAI to go back to the non-restricted, pre-checkpoint area in the airport to transfer the liquid from the two 50.7 ounce bottles into 3.2 ounce bottles.  SAI asked why SMITH would allow all of the exact same liquid through security—just in different containers. Aside from the fact SAI, like most people, did not have thirty-two empty 3.2-ounce bottles to the transfer the aloe juice into, it would have been incredibly cumbersome to carry that many bottles even if SAI did have them.

52.    SMITH then gave SAI an ultimatum: either SAI transfer the juice into small containers or the liquid is not going pass through the screening.

(THIRD AMENDED COMPLAINT)

53.     Now more than forty minutes into the screening, SAI again asked to drink some of the aloe juice because of a further escalating, immediate medical need.  SMITH responded that the agents had "offered some water."  ELLISON told SMITH that if SAI wanted to drink the juice, "he can take them outside the sterile area," meaning SAI would have to leave the checkpoint, take a drink, and then go through the entire security screening process again.

54.     SMITH then offered to have SAI'S medical liquid poured from the bottle into a small paper cup, just like the cup SAI had spilled most of the water from due to hand tremors.  SAI asked why SMITH would allow drinking the juice from a cup but not directly from the bottle.  SMITH essentially responded "because I said so."

55.     During this time, ELLISON directed that the bottles be ETD tested for explosive residue.  The test cleared; the juice was just juice, not a weapon.

56.     SAI was given the paper cup full of aloe juice, but, again, most of it ended up on the floor.  SAI was given one refill.

57.     Although SAI specifically explained to SMITH that the muscle tremors require using the heavier bottle, and SMITH had observed the water from the paper cup spilling due to the obviously visible tremors, SMITH refused to allow SAI to simply drink straight from the bottle

58.     Rather than obey the Special Needs Memo policy he specifically acknowledged and SAI accurately recited, or otherwise provide reasonable accommodation, SMITH simply laughed.

### SMITH Refuses to Allow the Juice Through the Security Checkpoint, Despite that It Tested Negative to the Explosive Residue Test

59.     SMITH gave SAI the choice to take the bottles out and put them in checked luggage,[2] to place the juice into thirty-two 3.2 oz. bottles, or to not travel

---

[2] SAI had no checked luggage, so this would have incurred additional cost, in addition to making the liquids unavailable until reaching RDU.

(THIRD AMENDED COMPLAINT)

with the medical liquids at all.  SAI felt detained by this scenario because the only way to continue onto the imminent cross-country, two-leg, twelve-hour trip was to surrender the liquid that could prevent and ameliorate the episode that was already coming on—and any others that might occur before reaching the final destination in Raleigh.  SMITH responded by saying "[y]ou're detained . . . you're holding yourself up because of the liquids."

60.    SMITH claimed SAI had an easy decision: fly without the liquids or don't fly.  For SMITH this may be an easy decision because he does not have the same medical need for immediate access to liquids.  However, for SAI the options were being stranded in San Francisco or risking a painful cross-country flight— with the possibility of flight delays, cancellations, or other incidents before being able to get to another grocery store—without access to medical liquids after the precursor to an episode had already started.

61.    SAI did not have the financial means to simply give up a non-refundable ticket and then buy a second ticket for the same trip, and the flight was boarding imminently, so SAI left the checkpoint without the medical liquids.

***Immediate and Subsequent Harm to SAI***

62.    SAI suffered immediate financial loss of $5.98, the retail value of the two seized bottles of aloe juice.

63.    During the nearly one hour screening, SAI suffered a significant episode of muscle tremors.

64.    Shortly after the checkpoint incident, SAI suffered a painful episode of muscle spasms that would have been prevented or ameliorated but for the additional stress caused by the unnecessarily prolonged screening and the unavailability of medical liquids.

65.    The checkpoint incident caused severe emotional distress, increased stress levels, and significant long-term worsening of SAI'S medical condition.

(THIRD AMENDED COMPLAINT)

66. SAI'S disabilities started around 20 years ago, and have been slowly progressive. Shortly after the SFO incident, they worsened dramatically.

67. Episodes of paralysis changed in frequency from once every two years from between 2007 and 2011 to six episodes in the period from July through December 2013 alone.

68. SAI'S baseline levels of photophobia increased dramatically. Before 2014, they generally allowed sighted navigation (with acute episodes causing blindness a couple times a year). By June 2014, Sai had to learn and critically depend on the use of a long white guide cane and Braille to navigate in nearly all lighting conditions, due to severe pain from most ordinary light sources.

69. SAI'S disabilities worsened so severely that in November 2014, SAI'S neurologist, psychologist, and general physician all recommended SAI obtain a service dog (not just a guide dog) to assist in activities of daily living, reduce dependence on caretakers, and summon help in case of an episode of paralysis that would otherwise cause SAI extreme pain, panic attacks, and possible death.

70. In June 2013, shortly after the SFO incident, SAI lost a well-paying job, due in part to the significant exacerbation of these mental and physical disabilities. SAI has been unable to obtain gainful full-time employment since losing that job and has depleted savings accumulated during employment in order to survive for the last four years. SAI'S disabilities are now so severe that most full-time jobs would be impossible without extensive accommodations.

**EXHAUSTION OF REMEDIES**

71. On March 14, 2013, SAI filed an administrative complaint and Federal Tort Claims Act ("FTCA") claim with DHS relating to the March 1, 2013 incident at SFO.

72. SAI received acknowledgment but no response to the administrative complaint from DHS within six months after it was filed. Pursuant to 28 U.S.C.

16

§ 2675(a), the "failure of [DHS] to make final disposition of a claim within six months after it is filed shall, at the option of [SAI] any time thereafter, be deemed a final denial of the claim for purposes of" filing a claim pursuant to the FTCA against FEDERAL DEFENDANTS.

73.     Furthermore, on November 5, 2014, SAI filed a lawsuit in the district court for the District of Columbia, *Sai v. Department of Homeland Security et al.*, Civil Action No. 14-1876, against DHS and TSA.  The district court granted injunctive relief in favor of SAI, ordering DHS to finally respond to SAI's administrative complaint no later than January 22, 2016.  *See generally Sai v. Dep't. of Homeland Sec.*, 149 F. Supp. 3d 99 (D.D.C. 2015).

74.     On July 20, 2016, TSA caused to be sent to SAI via certified mail a letter denying SAI's FTCA claim with regarding the SFO incident.  Such act also constitutes a final agency action under 28 U.S.C. § 2675(a) for purposes of filing a claim under the FTCA against FEDERAL DEFENDANTS.

## VICARIOUS LIABILITY

75.     SAI was harmed by the negligence, assault, and battery of certain CAS employees at SFO, including, but not limited to, ELLISON, ORILLE, SURENO, and AKENS.

76.     CAS is responsible for the harm caused by CAS employees, including, but not limited to, ELLISON, ORILLE, SUREN, and AKENS, at SFO because the CAS employees were acting in their capacity as employees of CAS when the incident at SFO occurred.

## CLAIMS

### ~~First Claim~~

### ~~Negligent Supervision pursuant to FTCA (28 U.S.C. § 1346)~~

### ~~(FEDERAL DEFENDANTS and DOES 101-200)~~

(THIRD AMENDED COMPLAINT)

77.   [Dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal.]

## Second Claim

### Assault

### (CONTRACTOR DEFENDANTS and DOES 101-200)[3]

78.   SAI fully incorporates herein by reference paragraphs 1-84 above.

79.   SAI repeatedly told CONTRACTOR DEFENDANTS the "medically necessary liquid" were required to mitigate the increasing episode of tremors, which had begun as a result of the emotional distress and increased stress caused by SAI's mistreatment during this ordeal at SFO.

80.   When SAI reached for the liquid, a CAS employee under the supervision of CONTRACTOR DEFENDANTS raised his hand to prevent SAI from picking up the bottle of "medically necessary liquid."  SAI reasonably believed the CAS employee was about to touch SAI in a harmful and offensive manner.

81.   SAI reasonably believed the CAS employee was going to carry out the threat of touching SAI to prevent SAI from drinking the "medically necessary liquid" because the CAS employee quickly reached in SAI's direction when SAI attempted to pick up the bottle of aloe juice.  CONTRACTOR DEFENDANTS intended to cause harmful and offensive contact with SAI by preventing SAI from drinking the  "medically necessary liquid" during the screening process, despite SAI's repeated declarations and visibly obvious symptoms of the immediate need to consume the liquid.

82.   SAI did not consent to this touching by the CAS employee and this touching did not occur during a search or pat-down of SAI's person.

_____

[3] The second, third, and fourth claims' headings (only) are corrected to refer to Does 101-200 (Covenant employees), rather than Does 1-100 (TSA employees), as this was a typographic error, and comports with this Court's ruling dismissing TSA employees but retaining Covenant's.

18

83.     The CONTRACTOR DEFENDANTS and CAS employees harmed SAI through their conduct by, including but not limited to:

a.     Causing a severe episode of tremors during the nearly one hour SAI was held by CAS and TSA;

b.     Causing a severe episode of muscle spasms after SAI was finally allowed to leave albeit without the "medically necessary liquids";

c.     Cause severe emotional distress, increasing stress levels, and significant long-term worsening of SAI's medical condition (which condition was also exacerbated by severe emotion distress and increased stress);

d.     Confiscating SAI's "medically necessary liquids";

e.     Contributing to the loss of SAI's job, and thereby sole source of income, in June 2013;

f.     Increased instances of atony; and

g.     Increased instances of mutism.

84.     The conduct of CONTRACTOR DEFENDANTS and CAS employees was a substantial factor in causing the harm to SAI.


**Third Claim**

**Battery**

**(CONTRACTOR DEFENDANTS and DOES 101-200)**

85.     SAI fully incorporates herein by references paragraphs 1-91 above.

86.     CONTRACTOR DEFENDANTS touched SAI or caused CAS employees under their supervision to touch SAI with intent to harm. CONTRACTOR DEFENDANTS, through the conduct of CAS employees under their supervision, prevented SAI from drinking the "medically necessary liquid" by quickly reaching towards SAI, touching SAI's hand which was holding the bottle, and physically preventing SAI from lifting the aloe juice bottle off of the table.

87.     SAI repeatedly informed CONTRACTOR DEFENDANTS and CAS employees the "medically necessary liquid" were required to mitigate the severe episode of tremors, which had begun as a result of the emotional distress and increased stress caused by SAI's mistreatment during this ordeal at SFO.

88.     SAI was attempting to drink from the bottle and did not consent to the CAS employee touching and physically preventing SAI from drinking.  This touching did not occur during a search or pat-down of SAI's person.

89.     The CAS employees and CONTRACTOR DEFENDANTS harmed SAI through their conduct by, including but not limited to:

a.      Causing a severe episode of tremors during the nearly one hour SAI was held by CAS and TSA;

b.      Causing a severe episode of muscle spasms after SAI was finally allowed to leave albeit without the "medically necessary liquids";

c.      Cause severe emotional distress, increasing stress levels, and significant long-term worsening of SAI's medical condition (which condition was also exacerbated by severe emotion distress and increased stress);

d.      Confiscating SAI's "medically necessary liquids";

e.      Contributing to the loss of SAI's job, and thereby sole source of income, in June 2013;

f.      Increased instances of atony; and

g.      Increased instances of mutism.


**Fourth Claim**

**Negligence**

**(CONTRACTOR DEFENDANTS and DOES 101-200)**

90.     SAI fully incorporates herein by references paragraphs 1-96 above.

91.     CAS contracted with TSA pursuant to the SPP to perform passenger screening services at SFO.

(THIRD AMENDED COMPLAINT)

92.     CONTRACTOR DEFENDANTS and CAS employees owed of a duty of care to SAI as a commercial passenger going through mandatory security measures at SFO to comply with the rules, regulations, and policies of TSA and DHS and ensure the safety of SAI and other passengers at SFO.

93.     CONTRACTOR DEFENDANTS and CAS employees have a statutory and regulatory duty to abide by all TSA and DHS rules, regulations, and orders in the inspection of all individuals or property before boarding an aircraft, including those set forth in the Special Needs Memo.  49 C.F.R. § 1544.207(b).

94.     CONTRACTOR DEFENDANTS breached their duty of care owed to SAI by, including but not limited to:

a.      failing to timely screen SAI's "medically necessary liquids";

b.      detaining SAI for an unreasonable amount of time without justification;

c.      confiscating SAI's "medically necessary liquids" without justification;

d.      failing to properly apply the TSA Special Needs Memo policy and exemption thereto for "medically necessary liquids"; and

e.      prohibiting SAI from accessing the "medically necessary liquids" after SAI repeatedly informed the CAS employees SAI required the liquids to mitigate the increasing episode of tremors, which had begun as a result of the emotional distress and increased stress caused by SAI's mistreatment during this ordeal at SFO.

95.     A reasonably careful person would have acted differently in the CONTRACTOR DEFENDANTS' situation, would have been knowledgeable of, and properly applied, the TSA's Special Needs Memo policy and medically necessary liquids exemption, would have permitted SAI to access the "medically necessary liquids" when SAI first announced the need for them, and would have allowed SAI to pass through the checkpoint with the "medically necessary liquids" after screening them for weapons and explosives.

96.     But for the negligent conduct of CONTRACTOR DEFENDANTS and CAS employees at SFO, SAI would not have been injured as described below.

97.     The negligent conduct of CAS employees and CONTRACTOR DEFENDANTS at SFO caused harm to SAI by, including but not limited to:

a.     Causing a severe episode of tremors during the nearly one hour SAI was held by CAS and TSA;

b.     Causing a severe episode of muscle spasms after SAI was finally allowed to leave albeit without SAI's "medically necessary liquids";

c.     Cause severe emotional distress, increasing stress levels, and significant long-term worsening of SAI's medical condition (which condition was also exacerbated by severe emotion distress and increased stress);

d.     Confiscating SAI's "medically necessary liquids";

e.     Contributing to the loss of SAI's job, and thereby sole source of income, in June 2013;

f.     Increased instances of atony; and

g.     Increased instances of mutism.

98.     CAS is vicariously liable for the negligent conduct of ELLISON, ORILLE, SURENO, AKENS, and CAS employees (DOES 101-200) because ELLISON, ORILLE, SUREN, AKENS, and CAS employees were acting within the scope of their duties at the time of the incident at SFO.


**Fifth Claim**

**Violation of 29 U.S.C. § 701 _et seq._ (Rehabilitation Act of 1973)**

**~~(FEDERAL DEFENDANTS and DOES 1-100)~~**

**(DHS Secretary)[4]**

99.     SAI fully incorporates herein by references paragraphs 1-105 above.

---

[4] Claim as to originally named defendants was dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal. Claim is amended to name the DHS Secretary, _id._

100.   SAI is an individual with permanent, episodic neurological disabilities that limit one or more major life activities.  *See* 42 U.S.C. § 12102(1), 29 U.S.C. § 705(20)(B).

101.   SAI was otherwise qualified to receive the benefits of participation in the domestic security screening program because SAI appeared at the SFO security checkpoint.  However, SAI was denied the benefits of the domestic security screening program solely because of SAI's disability and was not given reasonable accommodation for these disabilities.

102.   The DHS and TSA both receive federal financial assistance.

103.   The FEDERAL DEFENDANTS and DOES 1-100 excluded SAI from participation in the security screening program solely on the basis of SAI's disability and failed to provide a reasonable accommodation for SAI's disability. The FEDERAL DEFENDANTS and DOES 1-100 showed deliberate indifference to SAI's disabilities and immediate medical needs while denying SAI participation in the program and refusing to provide reasonable accommodation.

104.   This Court has ruled that the DHS Secretary is the sole proper defendant for this claim.

## Sixth Claim

### Violation of 42 U.S.C. § 12101 *et seq.* (Americans with Disabilities Act of 1990)

### (CONTRACTOR DEFENDANTS and DOES 101-200)

105.   SAI fully incorporates herein by reference paragraphs 1-110 above.

106.   SAI is an individual with permanent, episodic neurological disabilities that limit one or more major life activities.  *See* 42 U.S.C. § 12102(1), 29 U.S.C. § 705(20)(B).

107.   SAI was otherwise qualified to receive the benefits of participation in the domestic security screening program because SAI appeared at the SFO security

(THIRD AMENDED COMPLAINT)

checkpoint.  However, SAI was denied the benefits of the domestic security screening program solely because of SAI's disability and was not given reasonable accommodation for SAI's disability.

108.   CAS, ELLISON, and DOES 1-100 excluded SAI from participation in the security screening program solely on the basis of SAI's disability and failed to provide a reasonable accommodation for SAI's disability.

### ~~Seventh Claim~~

### ~~Violation of Administrative Procedures Act:~~
### ~~Agency Action Not in Accordance with Law~~

109.   [Dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal.]

### ~~Eighth Claim~~

### ~~Violation of Administrative Procedure Act:~~
### ~~Agency Action in Excess of Statutory Authority~~

110.   [Dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal.]

### ~~Ninth Claim~~

### ~~Violation of Administrative Procedure Act:~~
### ~~Agency Action Not in Accordance with Law~~

111.   [Dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal.]

### ~~Tenth Claim~~

### ~~Violation of Administrative Procedure Act:~~
### ~~Agency Action in Excess of Statutory Authority~~

(THIRD AMENDED COMPLAINT)

112.   [Dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal.]

## DEMAND FOR RELIEF

113.   WHEREFORE, plaintiff demands judgment against defendants as follows:

a.   For temporary, preliminary, and permanent injunctive relief enjoining FEDERAL DEFENDANTS from violating the TSA Special Needs Memo and the exemption for "medically necessary liquids";

b.   ~~For temporary, preliminary, and permanent injunctive relief enjoining FEDERAL DEFENDANTS to abide by the Administrative Procedure Act's rulemaking provisions in promulgating a rule regulating the carrying of liquids through TSA airport checkpoints;~~ [5]

c.   Damages[6] for physical injury and exacerbation of existing physical, neurological, and psychological disorders in an amount that is yet to be ascertained;

d.   Damages for medical expenses in an amount that is yet to be ascertained;

e.   For civil penalties as allowed by law;

f.   Exemplary damages in amount that is yet to be ascertained;

g.   For attorneys' fees and costs of suit; and

h.   For such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

114.   SAI demands a jury trial on all issues so triable.

Dated: January 25, 2018          By:___/s/ Sai_____
                                          Sai
                                          Plaintiff *Pro Se*

---

[5] This relief was sought under a dismissed claim.

[6] Monetary damages against Federal defendants under the Rehabilitation Act were dismissed, over opposition, by this Court on January 24, 2018, ECF No. 131, and preserved for appeal. Damages are still available under non-dismissed claims, and against non-Federal defendants.

25

**(THIRD AMENDED COMPLAINT)**